**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000668
29-NOV-2018
10:19 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KEITH KAUHANE, Defendant-Appellant

NO. CAAP-16-0000668

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 15-1-0808(4))

NOVEMBER 29, 2018

GINOZA, CHIEF JUDGE, REIFURTH and CHAN, JJ.

OPINION OF THE COURT BY GINOZA, CHIEF JUDGE

Defendant-Appellant Keith Kauhane (**Kauhane**) appeals from the "Judgment Conviction and Probation Sentence" (**Judgment**) filed on September 9, 2016, in the Circuit Court of the Second Circuit (**circuit court**).[1]

On June 7, 2016, Kauhane was charged via a Second Amended Complaint with: Failure to Disperse, in violation of Hawaii Revised Statutes (**HRS**) § 711-1102 (2014); Obstructing, in

---

[1] The Honorable Richard T. Bissen, Jr. presided.

violation of HRS § 711-1105(1)(a) (2014);[2] and Disorderly Conduct, in violation of HRS § 711-1101(1)(d) (2014). Following a jury trial, Kauhane was found guilty of Obstructing. At sentencing, Kauhane was sentenced for a petty misdemeanor under HRS § 711-1105(5).

On appeal, Kauhane asserts the following points of error: (1) the Second Amended Complaint is defective for failing to allege an element of Obstructing, specifically the asserted attendant circumstance that Kauhane's conduct had "render[ed] [the road] impassable without unreasonable inconvenience or hazard"; (2) the circuit court erred in failing to instruct the jury on the mitigating defense under HRS § 711-1105(5), which reduces Obstructing from a petty misdemeanor to a violation; (3) his conviction cannot stand because the evidence is insufficient to sustain the offense of Obstructing; and (4) the circuit court erred by sustaining the prosecution's objection during closing argument under the "golden rule" because the jury was entitled to consider Kauhane's choice-of-evils defense by "walking in his shoes."

---

[2] HRS § 711-1105 provides:

**§711-1105 Obstructing.** (1) A person commits the offense of obstructing if, whether alone or with others and having no legal privilege to do so, the person knowingly or recklessly:
  (a) Obstructs any highway or public passage; or
  (b) Provides less than thirty-six inches of space for passage on any paved public sidewalk.
(2) A person in a gathering commits the offense of obstructing if the person refuses to obey a reasonable request or order by a law enforcement officer:
  (a) To move to prevent or to cease any activity prohibited under subsection (1); or
  (b) To move to maintain public safety by dispersing those gathered in dangerous proximity to a public hazard.
(3) An order to move under subsection (2)(a), addressed to a person whose speech or other lawful behavior attracts an obstructing audience, is not reasonable if the obstruction can be readily remedied by police control.
(4) A person is not guilty of violating subsection (1) solely because persons gather to hear the person speak or because the person is a member of such a gathering.
(5) Obstructing is a petty misdemeanor if the person persists in the conduct specified in subsection (1) after a warning by a law enforcement officer; otherwise it is a violation.

We disagree with Kauhane regarding his first, third, and fourth points of error. However, given the evidence in this case, we agree with Kauhane's second point of error that the jury should have been instructed regarding the mitigating defense under HRS § 711-1105(5), which could reduce Obstructing from a petty misdemeanor to a violation. We thus vacate Kauhane's conviction for Obstructing and remand for a new trial.

## I. Background

On August 20, 2015, the Maui Police Department (**MPD**) Specialized Emergency Enforcement Detail (**SPEED**) team was assigned to accompany construction vehicles and equipment en route to the Daniel K. Inouye Solar Telescope (**DKIST**) construction site at the summit of Haleakalā on the island of Maui. At approximately mile marker two on Crater Road, the convoy encountered a number of individuals standing shoulder to shoulder blocking the road, forcing the convoy to stop. MPD Captain Clyde Holokai (**Captain Holokai**) approached the individuals and asked them to move off the roadway, which they did not do. The SPEED team got into formation and Captain Holokai then re-approached the individuals with the rest of the SPEED team. Captain Holokai and other SPEED team members repeatedly requested and ordered the individuals to get off the road. Many of the individuals dispersed, revealing seven additional people seated in the middle of the roadway with some linking arms, including Kauhane. These remaining individuals, including Kauhane, were subsequently arrested.

On June 7, 2016, the State of Hawai'i (**State**) filed its Second Amended Complaint against Kauhane. A jury trial commenced, and the trial took a total of three days.

On June 29, 2016, the jury returned its verdict and found Kauhane guilty as charged of Obstructing, but not guilty of Failure to Disperse or Disorderly Conduct.

On September 9, 2016, the circuit court entered its Judgment and sentenced Kauhane to, *inter alia*, six (6) months

probation, a fine of $300, and a one-day jail sentence with credit for time served.

On October 10, 2016, Kauhane filed a timely notice of appeal.

## II. Standards of Review

### A. Sufficiency of the Charge

"Whether a charge sets forth all the essential elements of a charged offense is a question of law which we review under the de novo, or right/wrong, standard." State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (quoting State v. Wells, 78 Hawaiʻi 373, 379, 894 P.2d 70, 76 (1995) (internal brackets, citations, ellipses, and quotation marks omitted)).

### B. Questions of Law

"Questions of law are reviewed upon appeal under the right/wrong standard of review." Cedillos v. Masumoto, 136 Hawaiʻi 430, 440, 363 P.3d 278, 288 (2015) (quoting Maile Sky Court Co. v. City & Cty. of Honolulu, 85 Hawaiʻi 36, 39, 936 P.2d 672, 675 (1997)).

### C. Sufficiency of the Evidence

> Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction. . . . The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Nakamitsu, 140 Hawaiʻi 157, 164, 398 P.3d 746, 753 (2017) (quoting State v. Richie, 88 Hawaiʻi 19, 33, 960 P.2d 1227, 1241 (1998)) (internal brackets omitted). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Richie, 88 Hawaiʻi at 33, 960 P.2d at 1241 (citation omitted).

## III. Discussion

### A. Sufficiency of the Charge in Second Amended Complaint

Kauhane asserts, and the State concedes, that the Second Amended Complaint was defective because it failed to

4

define the term "obstructs." Notwithstanding the State's concession, we "must still determine whether the error was properly preserved, was prejudicial . . . and is supported by the record." State v. Hoang, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000). Kauhane also argues he was prejudiced by the Second Amended Complaint's failure to include the definition of "obstructs" because it failed to provide notice of the State's burden to prove his conduct rendered Crater Road "impassable without unreasonable inconvenience or hazard." As to this argument, the State argues Kauhane did not object to the charge until the instant appeal and, under the Motta/Wells rule, has failed to prove he was prejudiced by the allegedly defective complaint because the definition of "obstructs" was given as a jury instruction and Kauhane was thus aware of the definition at trial.

The Supreme Court of Hawai'i has adopted the "Motta/Wells post-conviction liberal construction rule" for cases in which the sufficiency of a charge is challenged for the first time on appeal. Wheeler, 121 Hawai'i at 399, 219 P.3d at 1186; see also State v. Merino, 81 Hawai'i 198, 212, 915 P.2d 672, 686 (1996); State v. Motta, 66 Haw. 89, 90, 657 P.2d 1019, 1019-20 (1983); Wells, 78 Hawai'i at 381, 894 P.2d at 78.

> Under this approach, there is a "presumption of validity[]" for charges challenged subsequent to a conviction. In those circumstances, [the supreme court] will not reverse a conviction based upon a defective indictment or complaint unless the defendant can show prejudice or that the indictment or complaint cannot within reason be construed to charge a crime.

Wheeler, 121 Hawai'i at 399-400, 219 P.3d at 1186-87 (citations, some internal quotation marks and some brackets omitted).

Given that Kauhane is challenging the sufficiency of the Second Amended Complaint for the first time on appeal, we apply the Motta/Wells rule. The Second Amended Complaint charged the offense of Obstructing in Count Two as follows:

> COUNT TWO: (15-033234-002)
> That on or about the 20th day of August, 2015, in the County of Maui, State of Hawaii, KEITH KAUHANE, whether alone or with others and having no legal privilege to do so, did knowingly or recklessly persist to obstruct any highway or public passage, after a warning by a law enforcement officer to move to prevent or to cease such obstruction,

5

thereby committing the offense of Obstructing in violation of Section 711-1105(1)(a) of the Hawaii Revised Statutes.[3]

"Obstructs" is defined in HRS § 711-1100 (2014) as "renders impassable without unreasonable inconvenience or hazard." By comparison, the definition of "obstruct" in Black's Law Dictionary states:

> 1. To block or stop up (a road, passageway, etc.); to close up or close off, esp. by obstacle <obstruct the runway>. 2. To make difficult or impossible; to keep from happening; hinder <to obstruct the peace process>. 3. To cut off a line of vision; to shut out <the new construction obstructs our view of the road>.

*Obstruct*, Black's Law Dictionary 1246 (10th ed. 2014). The definition of "obstruct" set out in Merriam-Webster's Collegiate Dictionary states "[1]: to block or close up by an obstacle [2]: to hinder from passage, action, or operation : IMPEDE [3]: to cut off from sight[.]" *Obstruct*, Merriam-Websters Collegiate Dictionary (11th ed. 2003).

We disagree with Kauhane's claim, and the State's concession, that the Second Amended Complaint was defective for failing to define "obstructs." We conclude that the term "obstructs" as defined in HRS § 711-1100 comports with its commonly understood definition, and use of that term in the Second Amended Complaint is readily comprehensible to persons of common understanding. See State v. Mita, 124 Hawai'i 385, 390-93, 245 P.3d 458, 463-66 (2010) (holding that the definition of "animal nuisance" in a City and County of Honolulu ordinance was consistent with that term's commonly understood meaning and thus the charge, which did not include the definition, provided the defendant with fair notice of the offense charged); State v. Tsujimura, 140 Hawai'i 299, 308-09, 400 P.3d 500, 509-10 (2017) (holding it was not necessary to include the statutory definition of "alcohol" in the complaint because "the statutory definition

---

[3] It appears Count Two includes the following underlined language, that Kauhane did "persist to obstruct any highway or public passage, after a warning by a law enforcement officer to move to prevent or to cease such obstruction" (emphasis added), in order to address the requirement in HRS § 711-1105(5) that: "[o]bstructing is a petty misdemeanor if the person persists in the conduct specified in subsection (1) after a warning by a law enforcement officer; otherwise it is a violation." (Emphasis added).

'comport[s] with [the] commonly understood definition' of alcohol"); State v. Fujiyoshi, No. CAAP-15-0000916, 2018 WL 4178859 (Hawai'i App. Aug. 31, 2018) (mem. op.); Cf. State v. Pacquing, 139 Hawai'i 302, 308-09, 389 P.3d 897, 903-04 (2016) (holding that "because the statutory definition of 'confidential personal information' does not comport with its commonly understood definition, it is neither unmistakable nor readily comprehensible to persons of common understanding[,]" and thus the complaint was defective for not including the statutory definition) (some internal quotation marks omitted); Wheeler, 121 Hawai'i at 394-96, 219 P.3d at 1181-83 (holding that the term "operate" has been statutorily defined in a manner that does not comport with its commonly understood definition, thereby rendering the underlying oral charge, which did not define the term, insufficient).

Additionally, as to Kauhane's alternative argument, he has not shown he was prejudiced under the Motta/Wells rule in this case (even if we had determined the Second Amended Complaint was deficient). Because Kauhane did not challenge the sufficiency of the Second Amended Complaint in the trial court, and only raised it on appeal, we may consider information in the record below. State v. Hitchcock, 123 Hawai'i 369, 379, 235 P.3d 365, 375 (2010). Here, the statutory definition of "obstructs" was given to the jury, by the agreement of the parties, in Jury Instruction 26. Thus, Kauhane knew the definition of "obstructs" during the trial in the circuit court and we agree with the State to the extent that, even if we had determined the Second Amended Complaint was defective for not defining "obstructs", Kauhane was not prejudiced in these circumstances.

## B. Jury Should Have Been Instructed on Mitigating Defense

Kauhane argues that the circuit court committed plain error by not instructing the jury on the mitigating defense under HRS § 711-1105(5), which provides: "[o]bstructing is a petty misdemeanor if the person persists in the conduct specified in subsection (1) after a warning by a law enforcement officer; otherwise it is a violation." (Emphasis added). The State

concedes that, because there is some evidence to support Kauhane's assertion that he did not hear an order to leave the roadway, the circuit court plainly erred in not instructing the jury regarding the mitigating defense. Based on our independent review of this issue, we agree with Kauhane and the concession by the State.

At trial on direct examination, Captain Holokai testified as follows regarding the circumstances once he and the SPEED team reached the protesters at mile marker two and the warnings that were given:

> [CAPTAIN HOLOKAI] I ordered my team to get out of our vans. I walked up towards the line, and there was a gentleman in the red shirt, in a red shirt standing on the side of the road. Now, in the past, these are the people that claim to be their legal advisors, so I approached him and I asked him, "Are your people going to get off the road? Because we need to pass." He refused to answer me.
>
> . . . .
>
> [THE STATE] So after that contact, what did you and your SPEED team do?
>
> [Captain Holokai] I approached the line myself. And I asked them if they were going to be moving off the roadway if we could come through. There was no answer. I did that twice. There was no answer. So I walked back and we got our SPEED team into formation and we started approaching the line itself. <u>As we were walking, repeatedly myself and other officers on the team repeatedly ordered them to get off the roadway</u>. And at first they didn't move. But once we got closer, they just disbursed breaking up. Half of the line went to the left, and half went to the right.
>
> . . . .
>
> [THE STATE] After the first line of protesters moved, what, if anything, did you observe?
>
> [Captain Holokai] There were two groups seated facing each other almost forming a circle linked arm by arm.
>
> . . . .
>
> [THE STATE] Did these protesters move off the roadway on their own?
>
> [CAPTAIN HOLOKAI] No, not at all. No.
>
> [THE STATE] So were they arrested?
>
> [CAPTAIN HOLOKAI] Yes, they were. Yes.

(Emphasis added.)

On cross-examination, Captain Holokai further testified:

```
[DEFENSE COUNSEL]  Now, when you walked to the front of the
line when you initially got to the area where the protesters
were sitting down in the road, how many minutes did it take
for your officers to carry away my client and put him in the
van?

[CAPTAIN HOLOKAI]  Specifically five minutes or so.

[DEFENSE COUNSEL]  Five minutes?

[CAPTAIN HOLOKAI]  Yeah, it wasn't that long.  He was
passively resisting, so --

[DEFENSE COUNSEL]  And so when I looked at it, it looked
like it took maybe about a minute.

[CAPTAIN HOLOKAI]  No, it took a little longer than that.  I
had to walk up to him.  There was the commands being given.
Then we had to pry his arms off, put him on the -- put him
on the Mega Mover and then carry him off.
```

(Emphasis added.)

Pursuant to a question from the jury, the circuit court asked Captain Holokai if he told the seated protesters, including Kauhane, that "they would be arrested if they didn't move[.]" Captain Holokai replied, "Yes.  The initial line when I walked up to them, I did say that to them."

Following direct and cross-examination of Kauhane, the jury submitted the following question to him: "[d]id you hear officer say that you would be arrested if you didn't move?" Kauhane responded, "No, I didn't."  Neither the State nor defense counsel elected to re-examine Kauhane after his answer.

Also at trial, certain video clips were shown to the jury during the questioning of witnesses, which show the police approaching the line of protesters and some of the individuals sitting on the road behind the initial line, including Kauhane. The video includes audio of requests and orders by police, as they approach the initial line of individuals, to "get off" and "move off" the road.

In State v. Kikuta, 125 Hawai'i 78, 95-96, 253 P.3d 639, 656-57 (2011), the Hawai'i Supreme Court held that the trial court committed plain error in failing to instruct the jury on the mitigating defense of mutual affray, which reduced the offense of Assault in the Third Degree under HRS § 707-712 from a misdemeanor to a petty misdemeanor.  The supreme court explained that HRS § 701-115(1) provides that "[a] defense is a fact or set

9

of facts which negatives penal liability[,]" that mutual affray was a mitigating defense, and that the trial court must submit a mutual affray instruction to the jury where there is any evidence to support the defense. Id.; see also State v. Adviento, 132 Hawai'i 123, 138, 319 P.3d 1131, 1146 (2014). Further, in Kikuta, the supreme court noted "it is well established that a court must only instruct the jury on defenses which have support in the record, although that evidence may be 'weak, inconclusive, or unsatisfactory[.]'" 125 Hawai'i at 97, 253 P.3d at 658 (quoting State v. Riveira, 59 Haw. 148, 153, 577 P.2d 793, 797 (1978)).

The supreme court concluded in Kikuta that there was some evidence in the record to support the mutual affray defense, and thus, the jury should have been instructed on that defense. Id. at 97, 253 P.3d at 658. Given the lack of such an instruction, the defendant's conviction was vacated and the case was remanded for retrial. Id. at 97-98, 253 P.3d at 658-59.

Here, there is some evidence that Kauhane may not have heard the requests and orders by police to "get off" and "move off" the road, such that he did not persist in obstructing Crater Road as specified in HRS § 711-1105(1) after a warning by a law enforcement officer. See HRS § 711-1105(5). Because there is some evidence to support the mitigating defense under HRS § 711-1105(5) that reduces the Obstructing offense from a petty misdemeanor to a violation, it was plain error not to instruct the jury on this defense.[4]

### C. Sufficiency of the Evidence

Kauhane argues that there was insufficient evidence presented at trial to convict him of Obstructing because: (1) he had a "legal privilege" to gather in the roadway as a member of a peaceful protest pursuant to HRS § 711-1105(4); (2) there was no

---

[4] When the mitigating defense under HRS § 711-1105(5) is submitted to a jury for consideration, the jury should answer a special interrogatory regarding the defense. This would be similar to the mutual affray defense to Assault in the Third Degree, as addressed in Hawai'i Pattern Jury Instructions-Criminal (HAWJIC) No. 9.21A. See State v. Henley, 136 Hawai'i 471, 479-80, 363 P.3d 319, 327-28 (2015)(discussing HAWJIC 9.21A and holding that, given the evidence in that case, the circuit court should have provided the jury with an instruction and special interrogatory on mutual affray).

10

⌐

substantial evidence that he actually heard Captain Holokai's or any other warning to move and that he knowingly or recklessly persisted in obstructing the roadway; and (3) "the police's removal of Kauhane from the middle of Crater Road by carrying him to a police van is arguably the exact kind of 'obstruction that can be readily remedied by police control'[,]" citing HRS § 711-1105(3).

## 1.  Defense of Legal Privilege Under HRS § 711-1105(4)

Kauhane argues that he had a legal privilege to engage in the conduct at issue.  He asserts he was a member of a peaceful, non-violent protest of about twenty people, who were chanting and standing on the roadway while he was sitting on the road praying, and that his conviction is precluded as a matter of law under the United States Constitution, the Hawai'i Constitution, and HRS § 711-1105(4).  Although Kauhane makes reference to provisions in the United States and Hawai'i Constitutions and simply cites to certain cases,[5] his argument

---

[5]  Kauhane does not challenge the validity of HRS § 711-1105, but quotes without argument the following from Hague v. Comm. for Indus. Org., 307 U.S. 496 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

Id. at 515.  We note that subsequent to Hague and in addressing a conviction for "obstructing public passages," the United States Supreme Court recognized:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time.  The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.  The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order.  A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.  One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest.

(continued...)

addresses "[t]he legislature's recognition of protected constitutional free speech and expressive conduct" in HRS § 711-1105(4) and the commentary to HRS § 711-1105 generally. We thus focus on the defense under HRS § 711-1105(4).

Both affirmative and non-affirmative defenses place an "initial burden on the defendant to come forward with some credible evidence of facts constituting the defense, unless, of course, those facts are supplied by the prosecution's witnesses." HRS § 701-115 cmt. (2014).[6]

---

[5](...continued)
> Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

Cox v. State of La., 379 U.S. 536, 554-55 (1965). See also State v. Jim, 105 Hawai'i 319, 333-334, 97 P.3d 395, 409-10 (App. 2004) (relying on case law quoting Cox and holding that defendant's "continuing physical obstruction of the lawful work by the [Department of Water Supply] on [Hawaiian Home Lands] property constituted conduct clearly outside the scope of any first amendment right to freedom of speech"); State v. Guzman, 89 Hawai'i 27, 36, 968 P.2d 194, 203 (App. 1998) (citing Cox in holding that HRS § 852-1 (1993), regarding "Refusal to provide ingress or egress", did not need to be struck down for chilling free expression, where individuals picketing at the entrance of a hospital were arrested for refusing to provide ingress and egress).

[6]  HRS § 701-115 provides:

> **§701-115 Defenses.** (1) A defense is a fact or set of facts which negatives penal liability.
> (2) No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented, then:
> (a) If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt; or
> (b) If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability.
> (3) A defense is an affirmative defense if:
> (a) It is specifically so designated by the Code or another statute; or

(continued...)

The HRS § 711-1105(4) defense provides that "[a] person is not guilty of violating subsection (1) _solely_ because persons gather to hear the person speak or because the person is a member of such a gathering." (Emphasis added). The commentary to the Obstructing statute provides further, in relevant part:

> Although obstructing was formerly covered by the disorderly conduct statute, it raises certain important problems which indicate that it should have separate treatment. Primarily the problems relate to free speech and types of expressive conduct which, under the aegis of free speech, are constitutionally protected. Normally, the act of obstructing a public highway presents a great public inconvenience and serves no useful purpose. However, where the obstruction is caused by a crowd listening to a speaker, or even by a crowd protesting some official action, important goals are served by leaving the group as free from restriction as possible.
>
> . . . .
>
> Subsection (1) defines obstructing as knowing or reckless obstruction of any highway or public passage. "Obstructs" is defined in § 711-1100 as "renders impassable without unreasonable inconvenience or hazard." This conduct constitutes a violation, and if the defendant fails to heed a warning by a peace officer, it may be treated as a petty misdemeanor. However, subsection (4) makes clear that a person does not violate subsection (1) solely because of the fact that people gather to hear the person speak, or because the person is a member of such a gathering.

HRS § 711-1105 cmt.

Neither the Hawai'i Penal Code nor HRS § 711-1105 specifically designate HRS § 711-1105(4) as an affirmative defense or require that a defendant must prove the defense by a preponderance of the evidence. Thus, the defense under HRS § 711-1105(4) is not an affirmative defense.

> In the case of defenses which are not affirmative, the defendant need only raise a reasonable doubt as to the defendant's guilt. The other side of the coin is that the prosecution must prove beyond a reasonable doubt facts negativing the defense. The prosecution in fact does this when the jury believes its case and disbelieves the defense.

HRS § 701-115 cmt.

Given Kauhane's argument on appeal that there was _insufficient evidence_ to convict him because he had a legal

---

(...continued)

> (b)  If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence.

privilege under HRS § 711-1105(4), the question before us would typically be whether there is substantial evidence to support a jury determination that the HRS § 711-1105(4) defense did not apply. However, in this case, our review of the record indicates that the jury was not instructed regarding, and did not consider, the HRS § 711-1105(4) defense. Accordingly, the question here is not whether there was sufficient evidence to convict Kauhane, but whether we should notice plain error because there was credible evidence in the record warranting a jury instruction on the HRS § 711-1105(4) defense, such that the jury should have considered the defense. See State v. Taylor, 130 Hawai'i 196, 207, 307 P.3d 1142, 1153 (2013) (holding plain error could be noticed on appeal if the defendant has come forward with credible evidence going to a defense that the jury should have been able to consider); see also State v. Nichols, 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) (holding that "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.").

At trial in this case, there was no evidence that Kauhane was on Crater Road at the time in question solely because persons had gathered to hear him speak or because he was a member of a gathering to hear someone speak. According to Captain Holokai, who was in the first vehicle in the convoy transporting parts to the DKIST, when the convoy came near to mile marker 2 on Crater Road, he saw approximately fifteen to twenty people standing shoulder to shoulder blocking the roadway, such that there was no room on either side for the convoy to drive around. The convoy had to stop and Captain Holokai testified he approached the line of people.

> [CAPTAIN HOLOKAI] I approached the line myself. And I asked them if they were going to be moving off the roadway if we could come through. There was no answer. I did that twice. There was no answer. So I walked back and we got our SPEED team into formation and we started approaching the line itself. As we were walking, repeatedly myself and other officers on the team repeatedly ordered them to get off the roadway. And at first they didn't move. But once

we got closer, they just disbursed breaking up. Half of the line went to the left, and half went to the right.'

[THE STATE] So I want to talk about these protesters that went to the left and went to the right. Were any of them arrested?

[CAPTAIN HOLOKAI] No, no. Not at all, no.

[THE STATE] After the first line of protesters moved, what, if anything, did you observe?

[CAPTAIN HOLOKAI] There were two groups seated facing each other almost forming a circle linked arm by arm.

[THE STATE] Where in the roadway were those two groups sitting?

[CAPTAIN HOLOKAI] Right in the middle of the road on top. If there was -- I'm not sure if there was a yellow marker, but if there was, it would have been right there. Right in the middle of the roadway.

[THE STATE] Do you recall how many protesters were in each group that were seated?

[CAPTAIN HOLOKAI] I believe the first group there was four and the second group there were three.

[THE STATE] Did these protesters move off the roadway on their own?

[CAPTAIN HOLOKAI] No, not at all. No.

[THE STATE] So were they arrested?

[CAPTAIN HOLOKAI] Yes, they were. Yes.

[THE STATE] And about how many -- of the seven people who were seated in the two groups, how many of them were arrested?

[CAPTAIN HOLOKAI] All seven. All seven were arrested.

[THE STATE] If any protester from, as a command Captain for the SPEED team with the 25, approximately 25 officers under your command based on your training and experience, if any protester from these two groups had moved off of the roadway in accordance with your warning to move, would you have arrested, have that protester arrested?

[CAPTAIN HOLOKAI] No, not at all.

Captain Holokai further testified that members of the SPEED team had to pry apart the arms of the seven protesters that were arrested and, because they would not walk, these protesters had to be carried to a nearby transport van. Kauhane was among the seven protesters who were arrested and, according to Captain Holokai, Kauhane was chanting and praying as he was being carried off, he did not try to struggle, and he was practicing passive

15

resistance. Regarding passive resistance, Captain Holokai testified that the seven protesters were not actively trying to hurt the police or trying to run away, but were "just pretty much laying there" and the convoy could not continue past them because they were laying in the middle of the road.

Officer Russell Kapahulehua (**Officer Kapahulehua**) testified that he was a member of the SPEED team on the night in question and that he recalled Kauhane sitting in the center of the roadway, that there were seven arrests made at that site, and he believed being involved that evening that it was a dangerous situation. According to Officer Kapahulehua, when he arrived on the scene he saw a group of at least thirteen to fifteen people that were shoulder to shoulder across the roadway blocking the whole roadway, and when Captain Holokai asked them to move they moved out of the way. Officer Kapahulehua further testified that just behind that line of people was Kauhane and the other few people he was with, a few feet behind them was a group of three other people also sitting in the middle of the roadway, and there was a lot of chanting. Officer Kapahulehua testified that when Kauhane was taken off the roadway he was chanting in Hawaiian.

Kauhane testified in his defense that on August 20, 2015, he went to Crater Road to "pray," "protest," and raise awareness about the telescope construction. His testimony, in pertinent part, was as follows:

> [DEFENSE COUNSEL]  Now, on August 20th, 2015, you were on Haleakala, correct?
>
> [KAUHANE]  Yes.
>
> [DEFENSE COUNSEL]  And you went up there for what reason?
>
> [KAUHANE]  <u>I went up there to pray</u>.
>
> [DEFENSE COUNSEL]  <u>And did you know you were protesting</u>?
>
> [KAUHANE]  <u>Yes</u>.
>
> [DEFENSE COUNSEL]  And why were you protesting?  What did you want to prevent?
>
> [KAUHANE]  The desecration of our mountain, our sacred mountain, Haleakala.
>
> [DEFENSE COUNSEL]  And how did it personally affect you?  As far as protesting, what were you protesting about when it came to your personal self?

[KAUHANE]   To know -- to know that another telescope would be going up that's already been started being -- it's already in the beginning of being built.   Putting awareness out there more through protest letting people know that we're here and we are going to -- we will make people aware of that, this is what we need to do.

[DEFENSE COUNSEL]   Did you believe you were in imminent harm's way?

[KAUHANE]   Imminent harm, I don't understand that question. Imminent harms?

[DEFENSE COUNSEL]   Did you believe that you were at -- that because of the construction of the telescope it was going to somehow harm you?

[KAUHANE]   Yes.

[DEFENSE COUNSEL]   Did you believe it was going to harm other Hawaiians as well?

[KAUHANE]   Yes.

[DEFENSE COUNSEL]   And why did you think that it was going to harm you and other Hawaiians?

[KAUHANE]   Through spirituality, spiritually, mentally.   If you're not stable spiritually and mentally, eventually it starts to take a physical form on you.

(Emphasis added).

On cross-examination, Kauhane further testified in pertinent part as follows:

[THE STATE]   Now, Mr. Kauhane, you said in your direct examination that you were there on Crater Road on August 20th, 2015; is that right?

[KAUHANE]   Yes.

[THE STATE]   And you were there to protest?

[KAUHANE]   Yes.

[THE STATE]   And you were there to stop the transport of telescope material that morning, right?

[KAUHANE]   Yes.   Did I say yes to that? Did you ask me that?

. . . .

[THE STATE]   And you stated that you wanted to raise awareness about this incident; is that right?

[KAUHANE]   Yes.

[THE STATE]   And so you went up there and you purposefully obstructed the road?

[KAUHANE]   Went up there to pray.

[THE STATE]   Okay.   You went up there to pray?

17

[KAUHANE] Yes.

[THE STATE] <u>And you knew that by going up there to pray you were obstructing the middle of the road, right</u>?

[KAUHANE] <u>Okay, yes</u>.

[THE STATE] <u>So you were in the very middle of the road when the convoy came, right</u>?

[KAUHANE] <u>Yes</u>.

(Emphasis added).

Given the record, the evidence does not support a defense under HRS § 711-1105(4) that: "[a] person is not guilty of violating subsection (1) solely because persons gather to hear the person speak or because the person is a member of such a gathering." Thus, the lack of a jury instruction by the circuit court on the HRS § 711-1105(4) defense was not plain error.

### 2. Whether Kauhane heard a warning

As discussed in section III.B. above, the evidence in this case demonstrates ambiguity as to whether Captain Holokai's warning to the front line of protesters was heard by Kauhane. For purposes of a sufficiency of the evidence analysis, we view the evidence in a light most favorable to the State, and thus for purposes of this analysis there is substantial evidence to support a finding that Kauhane did hear Captain Holokai's warning. <u>See</u> <u>Nakamitsu</u>, 140 Hawai'i at 164, 398 P.3d at 753. As such, this issue may be considered in the retrial of this case related to the mitigating defense discussed in section III.B.

### 3. Police remedy

Kauhane's argument made pursuant to HRS § 711-1105(3) is not pertinent insofar as subsection (3) applies to offenses under HRS § 711-1105(2)(a). Here, Kauhane was charged and convicted under HRS § 711-1105(1)(a).

### D. Choice of Evils Defense and Golden-Rule Argument

The golden-rule argument is "[a] jury argument in which a lawyer asks the jurors to reach a verdict by imagining themselves or someone they care about in the place of the injured plaintiff or crime victim." *Golden-rule argument*, Black's Law Dictionary 807 (10th ed. 2014). "[G]olden-rule arguments ask the

jurors to become advocates for the plaintiff or victim and to ignore their obligation to exercise calm and reasonable judgment[.]" Id. Using golden-rule arguments is often considered improper in both civil and criminal cases. Ditto v. McCurdy, 86 Hawai'i 93, 127, 947 P.2d 961, 995 (App.1997) (citation omitted), aff'd in part, rev'd on other grounds, 86 Hawai'i 84, 947 P.2d 952 (1997); see also State v. Rogan, 91 Hawai'i 405, 414, 984 P.2d 1231, 1240 (1999) (noting a prosecutor's statement that "the incident was 'every mother's nightmare,' . . . was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position").

However, in the instant case, the following transpired during defense counsel's closing argument:

> [DEFENSE COUNSEL] . . . . So weigh it out. What's the harm versus what is he being imminently harmed with? What's the difference? You've got to weigh it out, and you as jurors, I hope, will weigh in favor of my client and find that he believed that there was going to be imminent harm.
>
> You know, we all experience -- you know, we all experience pain in various ways. We all experience mental pain and grief and anxiety in various ways. Pain, grief, and anxiety, that equals harm. It's the same thing.
>
> And again, the only way that you can really judge as jurors the vastness of the harm, the grief, the pain, the anxiety is to walk in [Kauhane's] shoes.
>
> [THE STATE] Objection, your Honor. Golden rule.
>
> THE COURT: Sustained.
>
> [THE STATE] Request a curative instruction.
>
> THE COURT: Approach.
>
> [Bench Conference]
>
> (The following was heard in open court.)
>
> THE COURT: You may continue, Counsel.
>
> [DEFENSE COUNSEL] In light of Jury Instruction Number 30,[7] I'm asking that you find that my client was justified

---

[7] Jury Instruction No. 30 addressed the choice of evils defense.

to be on the mountain at that point in time because he believed he was going to be suffering imminent harm from the desecration and the continuing desecration of Haleakala.

. . . .

(Emphasis added).

At trial, defense counsel urged the jurors to consider the harm from Kauhane's point of view by walking in his shoes, and the State's objection based on the golden-rule was sustained. The State now concedes on appeal that the golden-rule argument was not applicable. We agree with the State's concession in that the golden-rule argument was not applicable here where the jury was asked to consider the harm to defendant Kauhane from his point of view, rather than the jury being asked to imagine themselves or someone they care about in the place of a crime victim.

However, on appeal, Kauhane argues that the jury was entitled to consider Kauhane's choice of evils defense under HRS § 703-302 (2014)[8] "by weighing the reasonableness of his belief that his obstructing conduct was necessary to avoid an imminent

_____

[8] HRS § 703-302 provides:

> **§703-302 Choice of evils.** (1) Conduct which the actor <u>believes</u> to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
>
> (a)    The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;
>
> (b)    Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
>
> (c)    A legislative purpose to exclude the justification claimed does not otherwise plainly appear.
>
> (2)    When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.
>
> . . . .

(Emphasis added). HRS § 703-300 (2014) provides that "'Believes"' means reasonably believes."

harm or evil to himself or other Hawaiians by 'walking in his shoes.'"

In <u>State v. Maumalanga</u>, 90 Hawai'i 58, 63, 976 P.2d 372, 377 (1998), the Hawai'i Supreme Court held that "all of the elements of the choice of evils defense are contained within the express language of HRS § 703-302[.]" <u>See also</u> <u>State v. Friedman</u>, 93 Hawai'i 63, 71, 996 P.2d 268, 276 (2000) ("The choice of evils defense is defined entirely by HRS § 703-302 without regard to common law 'considerations.'"). Specifically, the supreme court adopted the reasoning by Associate Judge Acoba (then a member of the Intermediate Court of Appeals)[9] as set forth in parts IV through XI of Judge Acoba's concurring and dissenting opinion in <u>State v. Maumalanga</u>, 90 Hawai'i 96, 109-13, 976 P.2d 410, 423-27 (App. 1998) (Acoba, J., concurring and dissenting). Part of Judge Acoba's analysis adopted by the supreme court was that, under HRS § 703-302, a defendant's belief that the conduct chosen was necessary must be "objectively reasonable." 90 Hawai'i at 112, 976 P.2d at 426. Judge Acoba noted that under HRS § 703-300, "believes" means "reasonably believes", and this definition "was intended by the legislature to incorporate a 'reasonable [person] standard.'" 90 Hawai'i at 112 n.3, 976 P.2d at 426 n.3 (citing the Supplemental Commentary on HRS § 703-300).

Under <u>Maumalanga</u>, for purposes of Kauhane's choice of evils defense, his belief that the conduct chosen was necessary must have been "objectively reasonable." Thus, although the circuit court sustained the prosecution's objection during closing argument for an incorrect reason (<i>i.e.</i>, the golden-rule), defense counsel's argument that the only way to judge the vastness of the harm to Kauhane was to "walk in Kauhane's shoes" was -- in any event -- not proper for purposes of a choice of evils defense, because it did not incorporate a reasonable person standard. We note that after the State's objection was sustained, defense counsel was allowed to argue the choice of

---

[9] Associate Judge Acoba subsequently became a Justice of the Hawai'i Supreme Court.

evils defense "[i]n light of Jury Instruction Number 30," which addressed the choice of evils defense and included language that "defendant reasonably believes such conduct is necessary[.]"

In sum, although the circuit court erred in sustaining the State's objection based on the golden-rule argument, it was harmless error. See Hawai'i Rules of Penal Procedure Rule 52(a) ("[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

### IV. Conclusion

Based on Kauhane's second point of error, we vacate his conviction for Obstructing set forth in the "Judgment Conviction and Probation Sentence," filed in the Circuit Court of the Second Circuit on September 9, 2016. The case is remanded to the circuit court for further proceedings consistent with this opinion.


On the briefs:

Hayden Aluli,
for Defendant-Appellant.

Richard K. Minatoya,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge

22